**RECREATIONAL DEVELOPMENTS
OF PHOENIX, INC., et al.,
Plaintiffs,**

v.

**CITY OF PHOENIX, Defendant.**

**No. 99–18–PHX–ROS.**

United States District Court,
D. Arizona.

Aug. 23, 1999.

Christopher Reed Kaup, Peskind Hymson & Goldstein PC, Scottsdale, AZ, for plaintiffs.

James Harden Hays, Office of City Attorney, Phoenix, AZ, for defendant.

## ORDER

SILVER, District Judge.

This case presents a pre-enforcement challenge to an ordinance passed by Defendant City of Phoenix regulating businesses the ordinance refers to as "live sex businesses." Phoenix, AZ Code § 23–54 (1998). Pending are a Motion for a Preliminary Injunction filed by Plaintiffs, who are owners and members of businesses in which live sex acts occur ("the clubs"), and a Motion to Dismiss filed by Defendant.

## FACTUAL BACKGROUND

On December 9, 1998, the Phoenix City Council enacted § 23–54 of the Phoenix City Code, which states that "[t]he operation of a business for purposes of providing the opportunity to engage in, or the opportunity to view, live sex acts is declared to be a disorderly house and a public nuisance per se which should be prohibited." [1]

---

1. The entire text of the ordinance reads as follows:

Sec. 23–54. Findings; Definitions; Live Sex Act Businesses Prohibited.

Phoenix, AZ Code § 23–54 (1998). The ordinance allows Defendant to apply to the Municipal Court for an order permitting the City to abate violations of § 23–54, after which a judge is required to hold a hearing on whether the provision has been violated. If the judge concludes that a violation has occurred, Defendant is authorized to close the business. On December 16, 1998, the Phoenix City Council passed an amendment to § 23–54 adding subsection G, which exempted non-obscene performances "of any play, drama, or ballet in any theater, concert hall, fine arts academy, school, institution of higher education, or similar establishment" with certain additional limitations. Phoenix, AZ Code

A. The City Council makes the following findings:

1. The operation of a business for purposes of providing the opportunity to engage in, or the opportunity to view, live sex acts is declared to be a disorderly house and a public nuisance per se which should be prohibited, and

2. The operation of a live sex act business contributes to the spread of sexually transmitted diseases, and

3. The operation of a live sex act business is inimical to the health, safety, general welfare and morals of the inhabitants of the city of Phoenix.

4. Evidence in support of these findings may be found in *Sex Clubs, Factual Record* and the *Sexually Oriented Businesses, Factual Record, Supplement.*

B. In this section, unless the context otherwise requires:

1. *Consideration* means the payment of money or the exchange of any item of value for:

a. The right to enter the business premises, or any portion thereof, or

b. The right to remain on the business premises, or any portion thereof, or

c. The right to purchase any item permitting the right to enter, or remain on, the business premises, or any portion thereof, or

d. The right to a membership permitting the right to enter, or remain on, the business premises, or any portion thereof.

2. *Live sex act* means any act whereby one or more persons engage in a live performance or live conduct which contains sexual contact, oral sexual conduct, or sexual intercourse.

3. *Live sex act business* means any business in which one or more persons may view, or may participate in, a live sex act for a consideration.

4. *Operate and maintain* means to organize, design, perpetuate or control. Operate and maintain includes providing financial support by paying utilities, rent, maintenance costs or advertising costs, supervising activities or work schedules, and directing or furthering the aims of the enterprise.

5. *Oral sexual contact* means oral contact with the penis, vulva or anus.

6. *Sexual contact* means any direct or indirect touching, fondling or manipulating of any part of the genitals, anus or female breast by any part of the body or by any object or causing a person to engage in such contact.

7. *Sexual intercourse* means penetration into the penis, vulva or anus by any part of the body or by any object or manual masturbatory conduct with the penis or vulva.

B. It shall be unlawful for any person to operate and maintain a live sex act business.

C. Operation of a live sex act business is a public nuisance per se which may be abated by order of the Phoenix Municipal Court.

D. The City Attorney, in the name of the City of Phoenix, may apply to the Municipal Court for an order permitting the City to abate violations of this section.

E. After notice to the operator of a live sex act business, the judge shall conduct a hearing and take evidence as to whether a live sex act business is being operated in violation of this section.

F. If, at the conclusion of the hearing, the judge determines that a live sex act business is being operated in the City of Phoenix in violation of this section, an order shall be entered authorizing the City to abate the violation by closing the business. A copy of the order shall be delivered to the operator of the business and mailed to the owner of the property upon which the business is located.

G. Nothing in this section shall be construed to apply to the non-obscene presentation, showing, or performance of any play, drama, or ballet in any theater, concert hall, fine arts academy, school, institution of higher education, or similar establishment as a form of expression of opinion or communication of ideas or information, as differentiated from the promotion or exploitation of sex for the purpose of advancing the economic welfare of a commercial or business enterprise.

§ 23–54 (1998). On January 6, 1999, Plaintiffs applied for a temporary restraining order and preliminary injunction to prevent the ordinance from becoming effective as scheduled on January 8, 1999. Defendant filed a Motion to Dismiss and Memorandum of Law in Opposition to Plaintiff's Request for Injunctive Relief and on January 7, 1999, the Court denied the application for a temporary restraining order. A hearing for a preliminary injunction was scheduled and held on March 4, 1999. Plaintiff presented the testimony of three witnesses and both parties submitted several exhibits, including deposition testimony by club members and owners.

The clubs purport to be private organizations allowing access only to members. The membership application process appears to be similar at all the clubs who are Plaintiffs in this lawsuit. (W. Markus Test. at 65.) Anyone interested in visiting the social clubs arrives at a club, fills out a membership form, pays membership and per visit fees, and is generally permitted to enter the club at that time.[2] Annual membership fees start as low as $1 when business is slow, with the majority ranging from $5 to $10. (R. Reedy Dep. at 7, 12; M. Fencl Dep. at 21; W. Markus Dep. at 36–37; F. Magarelli Dep. at 22; R. Van Brunschot Dep. at 27; Brigham Dep. at 9; G. Mutschler Dep. at 43.) Most of the club's income is derived from the per visit fees, which generally range between $20 and $30 for each visit. (R. Reedy Dep. at 27; W. Markus Dep. at 36–37; G. Mutschler Dep. at 44.) In several of the clubs, fees for single women are considerably less expensive than for men or couples. (W. Markus Dep. at 37; F. Magarelli Dep. at 26.)

Not everyone is permitted to become a member on a given night. The club owner Plaintiffs assert that they refuse entry to applicants who are visibly intoxicated, attempt to introduce drugs into the club, are self-identified prostitutes, have neglected personal hygiene, or are improperly attired. Plaintiffs also claim that prospective applicants must be proponents of the swinging lifestyle, though they acknowledge that their ability to verify such information is limited.[3] (M. Fencl Dep. at 21–22; W. Markus Dep. at 31; W. Brigham Dep. 17.) Membership decisions are generally made by the person working the door on a given night, though on occasion, this person may consult with someone else with respect to a particular applicant.[4] Clubs frequently ask for a name, telephone number, address, birth date, driver's license or an identification card, though the information is not verified other than by inspecting the license to verify the age of the applicant. (W. Markus Dep. at 39.) Members of law enforcement and reporters are not permitted to enter the clubs unless they are in their individual, rather

**2.** Membership forms for the different clubs are virtually identical.

**3.** When one owner was asked how she verifies that an applicant is a proponent of the swinging lifestyle, she responded

[y]ou can tell how they treat their partner. You can tell by the questions they ask. If they—if they've been in the lifestyle, they'll ask you what your protocol is. They'll ask you ... what kind of guidelines your club has ... how clean it is; what kind of safe sex measures you recommend or don't; what kind of restrictions you place on people; what kind of rules you've got.

(W. Markus Test. at 54.)

**4.** The club with what is arguably the most selective membership application process was described by one club owner as follows: "[the person in charge of the door is] required to make sure that the person is the correct age, make sure that they are properly attired, make sure ... that they don't have an attitude problem, that they are not inebriated when they come in. As far as approval of the membership goes, if there's any question in the person taking care of the door's mind as to the appropriateness of the applicant, then they are to call either myself or my husband so that we can ask further questions and determine further if the person should be allowed to come in." (R. Van Brunschot Dep. at 20.) Club owners also stated that security guards will sometimes search an applicant's bag to make sure drugs, alcohol, cameras, or recording devices are not brought into the clubs. (F. Magarelli Dep. at 50.)

than official capacities, but this information is not verified. (W. Markus Dep. at 39.) Club owner Plaintiffs assert they exercise some additional control over their clientele; if, for example, someone violates the "no-touch" without consent rule, they may be asked to leave the club. (W. Markus Dep. at 26; M. Fencl Dep. at 22.) Club members may offer suggestions regarding operation of the clubs, but they have no control over the clubs' management. (F. Magarelli Dep. at 11.)

There is no requirement that prospective members be referred by other members or that applicants live in the Phoenix area. In fact, new members may be visitors from other parts of the United States or from other countries such as Europe and Japan. (W. Markus Dep. at 24, 30–31.) The clubs attract clientele by extensive advertising in local newspapers. (W. Markus Dep. at 40, M. Fencl Dep. at 17; F. Magarelli Dep. at 27.) Some clubs also operate websites promoting their businesses. (M. Fencl Dep. at 17; F. Magarelli Dep. at 51.) This strategy has proven successful; owners of the clubs estimate that they have between 3,000 and 12,000 members. (W. Markus Dep. at 38, estimating Guys and Doll's membership at 3,000; M. Fencl Dep. at 27, estimating Chameleon's membership at 12,000; F. Magarelli Dep. at 46, estimating Encounters' membership at 8,000 or 9,000.) Some club patrons acknowledge that they are members of several different clubs. (R. Reedy Dep. at 6–7; 12–13.) On any given night, member attendance is estimated at several hundred people per club. (W. Brigham Dep. at 19.)

The clubs boast dance floors and in some cases, dancing poles and cages available for use by members. They also offer food, non-alcoholic beverages, and activities such as billiards, darts, hot tubs, and erotic videos. In addition, the clubs provide individual rooms, some of which are designed to allow observation of the activities by other patrons, including sexual conduct. Club owners contend that employees of the clubs are prohibited from introducing members for the purpose of having sex, fraternizing with club members while working, or providing any adult entertainment—such as topless dancing, massages, or escort services—to club patrons. Club owners also assert that they do not allow their members to 'tip' a member for dancing or performing any acts including sexual acts. According to Plaintiffs, the clubs prohibit drugs, alcohol, prostitution, and solicitation of escorts on the premises.

Plaintiffs readily acknowledge that acts of oral sex and sexual intercourse occur regularly at the clubs, though they assert that such acts do not constitute the majority of the activities at the clubs. (W. Markus Dep. at 56; W. Bringham Test. at 43.) According to one club owner, sexual acts constitute ten to twenty per cent of the activity taking place over the course of an evening. (W. Bringham Test. at 43.) Plaintiffs claim that the clubs discourage members from engaging in unprotected sex through the provision of free condoms and the display of notices in the clubs encouraging the use of condoms. They acknowledge, however, that they merely attempt to motivate patrons to use condoms but do not enforce their use. (W. Markus Dep. at 51.) According to a report on an undercover investigation into some of the Plaintiffs' clubs written by a member of the Vice Enforcement Unit of the Phoenix Police Department:

> In the dozen times we have visited [Club Chameleon, Encounters, Discretions, Impressions, and Sociables II], we have observed approximately thirty-five couples engaging in sexual contact. This contact includes sexual intercourse, fellatio, cunnilingus, and self-masturbation. During all of these open sexual acts no condoms were seen by the detectives on any of the males involved. There were several open sexual acts which involved more than one couple. There were not any condoms observed during these encounters. The detectives noticed that the employees would check in the rooms when these sexual acts were being com-

mitted and would make no effort to ensure the parties involved used condoms. In several of the clubs condoms were found for sale. However, none of the clubs were found to be distributing free condoms to its customers.

(11/13/98 Vasquez Memo at 1, attached to Pls' Index of Exhibits as Ex. L.)

Plaintiffs also assert that they provide clean sheets after every use of the private rooms, that they drain and clean the hot tub if it is clear that it has been used for sexual intercourse, and that they disinfect the couches on a regular basis. According to the Vice Enforcement Unit's report, however, the cleanliness of the clubs is questionable.

> The open theaters in the clubs are surrounded by sofas and chairs. These areas are frequently used for some of the described sexual activities. Detectives have observed that after these sexual contacts no employees were seen cleaning any areas in the theater. The private rooms also had some of these problems. After customers used these private rooms, none of the sheets and towels were changed. This as well as the non·use of condoms appears to be a safety concern. The potential exist for unwanted contact with different bodily fluids which include saliva, semen, blood, and fecal matter.

(11/13/98 Vasquez Memo at 1, attached to Pls' Index of Exhibits as Ex. L.)

## LEGAL STANDARDS

■ To obtain a preliminary injunction, a party must demonstrate either (1) a combination of probable success on the merits and the possibility of irreparable injury, or (2) the existence of serious questions going to the merits and that the balance of hardships tips sharply in its favor. *Micro Star v. Formgen, Inc.*, 154 F.3d 1107, 1109 (9th Cir.1998) (internal quotation omitted). "These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases and the probability of success decreases." *Arcamuzi v. Continental Air Lines, Inc.*, 819 F.2d 935,

937 (9th Cir.1987) (internal quotation omitted). As an "irreducible minimum," the moving party must demonstrate a fair chance of success on the merits, or questions serious enough to require litigation. *Id.*

In determining whether a complaint states a claim for which relief can be granted pursuant to Fed.R.Civ.P. 12(b)(6), all allegations of material fact are taken as true and construed in the light most favorable to the Plaintiffs. *Yamaguchi v. United States Dept. of the Air Force*, 109 F.3d 1475, 1481 (9th Cir.1997); *Love v. United States*, 915 F.2d 1242, 1245 (9th Cir.1989). A complaint should not be dismissed for failure to state a claim unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Yamaguchi*, 109 F.3d at 1481 (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80, (1957)).

## LEGAL DISCUSSION

*Standing*

■ Defendant asserts that Plaintiffs lack standing to challenge the ordinance because they have failed to establish: "(1) a threatened or actual distinct and palpable injury to the plaintiff; (2) a fairly traceable causal connection between the injury and the defendant's challenged conduct; and (3) a substantial likelihood that the requested relief will redress or prevent the injury." *Wedges and Ledges of California, Inc. v. City of Phoenix*, 24 F.3d 56, 61 (9th Cir.1994). According to Defendant, Plaintiffs must admit that they operate in violation of § 23–54, which they have not done, before standing exists to challenge the ordinance. Defendant also argues that litigants generally only have standing to vindicate their own constitutional rights and that the exception for laws that may implicate constitutionally protected speech of third parties does not apply because the ordinance does not burden protected speech.

As Plaintiffs note, however, to fulfill the "actual injury" standing requirement, they need only show a " 'reasonable threat of prosecution for conduct allegedly protected by the Constitution.' " *Ripplinger v. Collins*, 868 F.2d 1043, 1047 (9th Cir.1989) (citations omitted). They have clearly met this burden because, as Defendant's counsel acknowledged at the hearing on the temporary restraining order, "[w]hat [Defendant] did just recently was in response to ... hav[ing] six, seven or eight of these businesses operating in the City of Phoenix, was draft something specifically directed at the conduct which occurs in [the businesses]." (Trans. of TRO Hearing, attached to Pls' Resp. as Ex. A.) As these comments make clear, the ordinance was carefully drafted to target the conduct allegedly occurring at the clubs. If the ordinance is enforced against Plaintiffs, the owners and members could suffer economic injury based on lost profits and the lost value of their membership dues. More importantly, if the conduct alleged by Plaintiffs to be expressive conduct is found to be protected by the First Amendment, enforcement of the ordinance may infringe their First Amendment rights. As the Supreme Court has recognized, pre-enforcement challenges to laws may be particularly appropriate in the First Amendment context, where the threat of enforcement could have a chilling effect on speech even if the statute is never enforced. *Virginia v. American Booksellers Ass'n, Inc.*, 484 U.S. 383, 391, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988) (noting that "the alleged danger of this statute is, in large measure, one of self-censorship; a harm that can be realized even without an actual prosecution"). Given Defendant's eagerness to enact an ordinance directed at sexual conduct allegedly occurring within the clubs and the consequent high likelihood of enforcement, Plaintiffs have standing to challenge the ordinance.

*The Hardships*

Plaintiffs claim that they will suffer irreparable harm if the Court does not grant a preliminary injunction. They assert that if the clubs are forced to close, the First Amendment rights of the club members will be infringed and that the deprivation of such rights, "for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *Ebel v. City of Corona*, 698 F.2d 390, 393 (9th Cir.1983). Plaintiffs also claim that the if the ordinance is not enjoined, the clubs would be subject to forcible closure, causing the owners to lose business and the members' annual memberships to be rendered worthless.

According to Plaintiffs, Defendant will suffer no harm if the ordinance is enjoined. Plaintiffs assert that though the ordinance states that a business falling within the definition of a "live sex act business" is "a public nuisance *per se* " and is "inimical to the health, safety, general welfare and morals," the only *specific* justification for the ordinance is to stop the spread of sexually transmitted diseases. Phoenix, AZ Code § 23–54 (1998). Plaintiffs maintain that because there was no evidence that the clubs are any more responsible for the spread of sexually transmitted diseases than "bars, nights clubs, singles clubs, or church socials," Defendant cannot establish harm from injunction of the ordinance.

*Right To Privacy*

Plaintiffs assert that § 23–54 violates their right to privacy protected by the Fourteenth Amendment's Due Process Clause. The Ninth Circuit has noted, "[t]he Supreme Court has not defined the outer limits of the right of privacy, but has extended the right to cases involving personal decisions about marriage, procreation, contraception, family relationships, child rearing and education, and abortion." *Fleisher v. City of Signal Hill*, 829 F.2d 1491 (9th Cir.1987); *see, e.g.; Carey v. Population Servs. Int'l*, 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977) (abortion); *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) (same); *Griswold v. Connecticut*, 381 U.S. 479, 485, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (contra-

ception). Plaintiffs concede that the Supreme Court has not concluded that the right to privacy protects the sexual activities of consenting adults in all situations. (Pls' Supp.Mem. at 17.) In *Bowers v. Hardwick*, 478 U.S. 186, 191, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986), for instance, the Supreme Court rejected the notion that its privacy jurisprudence "stand[s] for the proposition that any kind of private sexual conduct between consenting adults is constitutionally insulated from state proscriptions[.]" Moreover, the Supreme Court has specifically "declined to equate the privacy of the home ... with a 'zone' of 'privacy' that follows a distributor or a consumer ... wherever he goes." *Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 65–67, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973); *see also, Ellwest Stereo Theatres, Inc. v. Wenner*, 681 F.2d 1243, 1248 (9th Cir.1982) (noting that "we decline to hold that the 'right' to unobserved masturbation in a public theater is 'fundamental' or 'implicit in the concept of ordered liberty' ").

▇▇▇ Plaintiffs attempt to distinguish cases such as *Paris Adult Theatre* by arguing that the clubs are private membership organizations which members consider to be "extensions of the home" and therefore protected by the Fourteenth Amendment's right to privacy. (West Aff. at ¶ 5; R. Brunschot Aff. at ¶ 13; W. Markus Aff. at ¶ 13.) Courts have applied a variety of factors to determine whether an organization is a private membership organization, including the selectivity of membership, membership control over the operations of the establishment, the history of the organization, the use of facilities by non-members, the purpose of the club's existence, whether the club advertises for new members, whether the club is profit or non-profit, and whether the club uses formalities such as bylaws, meetings, and membership cards.[5] *United States v. Lansdowne Swim Club*, 713 F.Supp. 785, 796–97 (E.D.Pa.1989); *Welsh v. Boy Scouts of America*, 993 F.2d 1267, 1276 (7th Cir.1993); *Hendricks v. Commonwealth*, 865 S.W.2d 332 (Ky.1993) (applying these factors in concluding that a membership organization offering nude dancing was not a private club). The case law provides that the most important of these factors is membership selectivity. *Welsh*, 993 F.2d at 1276; *Brounstein v. American Cat Fanciers Assoc.*, 839 F.Supp. 1100, 1106 (D.N.J.1993) (noting that "[t]he touchstone of the determination of whether a membership organization is a 'place of public accommodation' is its selectivity in the admission of its members"); *Lansdowne Swim Club*, 713 F.Supp. at 797 (same); *Brown v. Loudoun Golf & Country Club*, 573 F.Supp. 399, 403 (E.D.Va. 1983) (noting that "[t]he key factor is whether the club's membership is truly selective"). The degree of selectivity of a membership process is measured, in part, on factors such as the substantiality of the membership fee, members' control over the selection of new members, the numerical limit on club membership, the formality of the club's admission procedures, the criteria for admission, and the number of prospective applicants denied membership. *Lansdowne Swim Club*, 713 F.Supp. at 797.

In organizations in which the membership selection process is rigorous and restrictive, courts have found the entities to be private, rather than public. In *Kiwanis Int'l v. Ridgewood Kiwanis Club*, 806 F.2d 468 (3rd Cir.1986), for instance, the Third Circuit considered whether a local chapter of the Kiwanis Club, which had restricted its membership to men, was a place of public accommodation within the

---

**5.** Some of the cases addressing this issue involved organizations attempting to circumvent racial or sexual discrimination laws, claiming they are private clubs, rather than places of public accommodation. Therefore, the cases do not all address constitutional claims. However, the factors courts have relied on in cases involving public accommodation and other statutory claims are helpful in assessing Plaintiffs' privacy claim, and both parties rely on such cases in their memoranda. (Pls' 3/2/99 Resp to Defs' Motion to Dismiss at 19; Def's 2/26/99 Mot. to Dismiss at 4.) Accordingly, the Court will consider these cases in its analysis of Plaintiffs' privacy claim.

meaning of state anti-discrimination laws. The Third Circuit noted that the club consisted of only twenty-eight members, ten of whom had been members for over twenty years. *Id.* at 475. The Third Circuit also noted that the club had admitted no more than twenty members over the course of the past decade. *Id.* Each new member had to be sponsored by a current member and formally approved by vote of the club's board of directors. *Id.* Concluding that the club had not "opened its membership rolls to the 'community at large,'" the Third Circuit held that the club was not a place of public accommodation. *Id.*

In organizations in which the membership selection process is deemed insufficiently selective, courts have rejected the organization's self-characterization as a private club. In *Lansdowne Swim Club,* the federal district court of the Eastern District of Pennsylvania painstakingly scrutinized the membership criteria for an allegedly private swimming club and concluded that its membership selection process did not transform the organization into a private club. 713 F.Supp. at 805. The court reached this conclusion despite the fact that the organization "requires substantial membership fees, places a limit [of 500] on the number of shareholder members, and utilizes a formal admission procedure that has been controlled by the shareholder members since 1978"—restrictions that are significantly absent in the instant case. *Id.* at 800–801. Instead, the court focused on "[t]he Club's interview of potential members [as] not probing and, moreover, provid[ing] no information to voting members that is useful in making an informed decision as to whether the applicant and his or her family would be compatible with the existing members." *Id.* at 800. In addition, the court noted, "[a] process whereby 'the members ... decide for themselves on whatever grounds they deem suitable whether or not they wish to associate with the applicant' is a process that has no purpose or plan of exclusiveness." *Id.* at 801 (citations omitted); *see also, Brounstein,* 839 F.Supp. at 1106 (concluding that a membership organization that is "open to any person eighteen years of age or older, who is interested in cats ... upon making application for membership ..." was not a private membership organization).

In the instant case, the degree of selectivity of membership by the clubs falls far short of the selectivity of membership in *Kiwanis Int'l.* The clubs advertise in newspapers and operate websites promoting their establishments. They clearly make the lion's share of their income from per visit usage fees, rather than membership dues, which, in some cases, is as low as $1 for an annual membership. There appears to be no numerical or geographical limit on membership, and clubs have as many as 12,000 members, including travelers from as far away as Europe and Japan. While some patrons on a given night may know each other, many are complete strangers.[6] Membership criteria is virtually non-existent. An individual wishing to attend a social club simply arrives at the club, provides the club with his or her name, address, age, and minimal other information, pays a small fee, and is generally immediately given a membership card.[7] Mem-

---

**6.** One club member submitted an affidavit stating his belief that the clubs were "extensions of the home," but he acknowledged that the social clubs were actually quite different from his home. When asked if he considered his home more private than a club, he responded: "Absolutely. I know who is in my home.... I don't know who is in a club of 300 people...." (Brigham Dep. at 19.)

**7.** Prospective applicants are asked to read the membership application form, which includes some information regarding club rules. However, owners acknowledge that they only require applicants to sign the form and they make no effort to ensure that applicants read what they sign. (G. Mutschler Dep. at 49–50.) When one club owner was asked if an applicant who merely filled in her name, address, and driver's license and signed the form without reading it could become a member, he responded: "After I look at the driver's license and assume who they are and if they look like a good person, look like somebody who would fit in the club and I explain to them what the club is, private social club, et cetera, then, yes, they could become a member." (*Id.* at 49.)

bers exercise no control over the selection of other members; prospective applicants are generally refused entry only if they are visibly intoxicated, act inappropriately, are dressed poorly, carry visible weapons, or are self-identified on-duty prostitutes, reporters, or law enforcement officials. As one club owner stated, in order to be approved as a member, an applicant must simply "[b]e an upstanding person, look decent, not a bum, be aware that it is a private membership club." (G. Mutschler Dep. at 9.) Once applicants have been allowed to join the clubs, they may be asked to leave if they violate a club rule, by, for instance, touching another member without his or her consent. It is difficult to discern how these selection criteria differ from those used by public nightclubs, where bouncers select those standing in line who are suitably attired, or from virtually all public establishments, where those who are visibly intoxicated or otherwise labeled troublemakers are often refused entry or asked to leave. Finally, the clubs are for-profit organizations in which members have no control over the management of the club aside from their ability to make suggestions. In sum, the membership status of the clubs is more fiction than reality. It is clear that the clubs are no more private than those in other cases in which courts have rejected the self-characterization of entities as private membership organizations. *See, e.g., 31 West 21st Street Associates v. Evening of the Unusual, Inc.,* 125 Misc.2d 661, 480 N.Y.S.2d 816, 829 (1984) (finding that a self-proclaimed private membership organization, which advertised in local newspapers and had no real criteria for membership aside from the fact that the applicant "appears at the front door of [the club] and pays the entrance fee[,]" was not a private club); *Hendricks v. Commonwealth,* 865 S.W.2d 332, 334–35 (Ky.1993) (concluding that a nude dancing club, which had no numerical limit on membership, minimal membership fees, no formalities to the admission of new members, no selection criteria, and no

membership control over new member selection was not a private membership club).

The Court finds that the clubs in the instant case are not private membership organizations. Accordingly, Plaintiffs' privacy claim cannot form the basis for enjoining the ordinance.[8]

*Overbreadth*

■ As mentioned above, the Supreme Court has relaxed standing requirements in the First Amendment context, allowing plaintiffs to bring facial challenges to statutes in some circumstances. According to the overbreadth doctrine, "an individual whose own speech or conduct may be prohibited is permitted to challenge a statute on its face 'because it also threatens others not before the court—those who desire to engage in legally protected expression but who may refrain from doing so rather than risk prosecution or undertake to have the law declared partially invalid.'" *Board of Airport Comm'rs v. Jews for Jesus, Inc.,* 482 U.S. 569, 574, 107 S.Ct. 2568, 96 L.Ed.2d 500 (1987) (citation omitted). However, standing to bring a facial overbreadth claim is limited. *Broadrick v. Oklahoma,* 413 U.S. 601, 615, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). This is particularly true "where conduct and not merely speech is involved, [in which case, the Court] believe[s] that the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Id.* In rejecting a facial overbreadth challenge to an ordinance that prohibited sitting or lying on sidewalks in commercial areas during certain hours, the Ninth Circuit stated:

> The fact that sitting can possibly be expressive ... isn't enough to sustain plaintiffs' facial challenge to the ... ordinance. It's true that our ordinary reluctance to entertain facial challenges is somewhat diminished in the First Amendment context. However ... [c]onsistent with [its] speech-protective

---

8. Because this determination was reached as a result of a fact-intensive inquiry, however,

Defendant's motion to dismiss Plaintiffs' privacy claim is denied.

purpose, the Supreme Court has entertained facial freedom-of-expression challenges only against statutes that, 'by their terms,' sought to regulate 'spoken words,' or patently 'expressive or communicative conduct' such as picketing or handbilling.

*Roulette v. City of Seattle*, 97 F.3d 300, 303 (9th Cir.1996) (citations omitted). Additional examples of conduct which the Ninth Circuit has identified as constituting "patently 'expressive communicative conduct' " include placing symbols such as Nazi swastikas on public or private property, making political contributions, and engaging in topless barroom dancing. *Id.* at 303, 304 n. 6. The Ninth Circuit has made clear that the possibility that expressive conduct may be indirectly burdened by a statute is an insufficient basis for a facial overbreadth claim, noting that "a facial freedom of speech attack must fail unless, at a minimum, the challenged statute '*is directed narrowly and specifically* at expression or conduct commonly associated with expression.' " *Id.* at 305 (emphasis added). Thus, ordinances prohibiting all "barroom type topless dancing" or all live entertainment within a large geographic area have been successfully challenged on overbreadth grounds. *BSA, Inc. v. King County*, 804 F.2d 1104, 1106, 1109–10 (9th Cir.1986); *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 74 n. 15, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981). But in cases in which, "although hypothetical examples in which [an ordinance] may be overbroad can be imagined, these examples, in comparison to its legitimate sweep, are not substantial," overbreadth challenges have failed. *J & B Entertainment, Inc. v. City of Jackson, Mississippi*, 152 F.3d 362, 366–67 (5th Cir.1998) (concluding that a prohibition on public nudity was not overbroad even if it hypothetically prohibited public breast feeding because breast feed-

ing was not protected by the First Amendment); *Roulette*, 97 F.3d at 305. In order to succeed with a facial overbreadth challenge, there must be "a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court[.]" *City Council v. Taxpayers*, 466 U.S. 789, 798–99, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984). As the Supreme Court has noted, a finding of overbreadth is "strong medicine" to be used "sparingly and only as a last resort." *Broadrick*, 413 U.S. at 613, 93 S.Ct. 2908.

▇ Defendant argues that any constitutional infirmities in the initial draft of § 23–54 were cured by the amendment, enacted on December 16, 1998, one week after the enactment of § 23–54, which states:

> Nothing in this section shall be construed to apply to the non-obscene presentation, showing, or performance of any play, drama, or ballet in any theater, concert hall, fine arts academy, school, institution of higher education, or similar establishment as a form of expression of opinion or communication of ideas or information, as differentiated from the promotion or exploitation of sex for the purpose of advancing the economic welfare of a commercial business enterprise.

Phoenix, AZ Code § 23–54 (1998). Plaintiffs respond by reciting a litany of hypotheticals which they argue would fall under the sweep of the ordinance, rendering it impermissibly overbroad. Some of Plaintiffs hypotheticals strain the imagination; no court is likely to agree with Plaintiffs' assertion that "a church singles group in which members are to bring a 'pot luck' food item is arguably a 'live sex business' if two members engage in 'sexual contact' following a meeting since they have paid a 'consideration.' " [9] (Pls' Mem.

---

9. Moreover, in order for such an example to be relevant to an overbreadth analysis, Plaintiffs need to demonstrate why attendance at a church potluck would constitute expression within the meaning of the First Amendment, which they have made no effort to do.

*Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 571, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991) (noting that the First Amendment does not protect nude sunbathers); *J & B Entertainment, Inc.*, 152 F.3d at 366 (noting that "nude infants and women breast feeding in a park

at 45.) Nor is it realistic to conclude that "a hospital or doctor's office which demonstrates breast feeding or testing for breast cancer to an individual or a group" will alter its presentations in fear of prosecution as a live sex act business under the ordinance. (*Id.*) Unrealistic hypotheticals aside, Plaintiffs are correct in noting that the ordinance arguably implicates some protected conduct, even in its amended form. The amendment specifically limits the type of performances exempted from the ordinance's scope to "play[s], drama[s], or ballet[s.]" Phoenix, AZ Code § 23–54 (1998). Thus, non-obscene erotic dance performances and other non-obscene performances that are not plays, dramas, or ballets are covered by the provision and potentially prohibited. The ordinance defines "sexual contact," which is included in the definition of a live sex act, as "any direct or indirect touching, fondling or manipulating of any part of the genitals, anus, or female breast, by any part of the body or by any object or causing a person to engage in such contact." *Id.* Although the Court is unfamiliar with the range of conduct included in erotic dance performances, it is conceivable that some dancers may engage in non-obscene conduct included in the definition of sexual contact as part of a performance. If so, the ordinance could conceivably implicate a constitutionally protected right to engage in such expressive conduct. *Barnes*, 501 U.S. at 566, 111 S.Ct. 2456 (noting that "nude dancing ... is expressive conduct within the outer perimeters of the First Amendment, though we view it as only marginally so").

Such a scenario, while conceivable, is insufficient to invalidate the ordinance on overbreadth grounds. For a facial overbreadth claim to succeed where, as here, conduct, rather than mere speech is involved, "the overbreadth of a statute must not only be real, but substantial as well, judged in relation to its plainly legitimate sweep." *Broadrick*, 413 U.S. at 616, 93

S.Ct. 2908. As the Supreme Court has noted, "the mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." *Members of City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 800, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984). Although a statute that, "by its terms" was "directed narrowly and specifically" at performances of non-obscene erotic dancing would be unconstitutionally overbroad, the ordinance at issue does not suffer from such an infirmity. It does not even mention dancing. Moreover, in its findings, § 23–54 makes clear that the focus is on live sex act businesses which contribute to the spread of sexually transmitted diseases, a concern not present in establishments limited to erotic dancing. Accordingly, the statute is not unconstitutionally overbroad. *See also, Farkas v. Miller*, 151 F.3d 900, 905 (8th Cir.1998) (noting that an amendment to a public nudity law similar to the one in the instant case saves the statute from being overbroad). "[W]hatever overbreadth may exist should be cured through case-by-case analysis of the fact situations to which its sanctions, assertedly, may not be applied." *Broadrick*, 413 U.S. at 616, 93 S.Ct. 2908. As the Fifth Circuit noted in response to hypothetical overbreadth arguments, "[i]f John Grisham reads one of his novels in the nude or the New Stage Theatre stages a production of 'Hair,' courts can evaluate whether these activities fall within the scope of the exception [to the statute]." *J & B Entertainment, Inc.*, 152 F.3d at 367. Therefore, Defendant's Motion to Dismiss is granted with respect to Plaintiffs' overbreadth challenge.

*Vagueness*

 Plaintiffs also assert that the ordinance is impermissibly vague in violation of the Due Process Clause of the Fourteenth Amendment. "[E]ven if an en-

---

are not protected by the First Amendment because they are not engaged in expressing

any idea").

actment does not reach a substantial amount of constitutionally protected conduct, it may be impermissibly vague because it fails to establish standards for the police and public that are sufficient to guard against the arbitrary deprivation of liberty interests." *City of Chicago v. Morales*, 527 U.S. 41, 119 S.Ct. 1849, 1857, 144 L.Ed.2d 67 (1999). In order to survive a vagueness challenge, a law must also "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). Laws with civil penalties are scrutinized less stringently than laws with criminal penalties, though if they potentially interfere with First Amendment rights, "a more stringent vagueness test should apply." *Village of Hoffman Estates, et al. v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982). However, "due process does not require 'impossible standards' of clarity." *Kolender v. Lawson*, 461 U.S. 352, 361, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983) (citation omitted). "Condemned to the use of words, we can never expect mathematical certainty from our language." *Grayned*, 408 U.S. at 110, 92 S.Ct. 2294.

▆▆▆▆ Plaintiffs claim that § 23–54 is unconstitutionally vague facially and as applied to their conduct. If an enactment implicates no constitutionally protected conduct, a facial vagueness challenge will fail unless "the enactment is impermissibly vague in all of its applications." *Hoffman*, 455 U.S. at 495, 102 S.Ct. 1186; *IDK, Inc. v. Clark County*, 836 F.2d 1185, 1198 (9th Cir.1988) (noting that "[t]he absence of a significant first amendment interest is . . . fatal to a facial challenge of a business regulation for vagueness unless the regulation is vague in all possible applications"). "A plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Hoffman*, 455 U.S. at 495, 102 S.Ct. 1186. To prevail on an as applied vagueness challenge, Plaintiffs must establish that the club owner and member Plaintiffs can not understand the meaning of the ordinance sufficiently to determine how to conform their behavior to it.

Plaintiffs meticulously dissect the ordinance, claiming numerous terms are undefined and ambiguous. They argue, for instance, that "the term 'act' . . . is wholly undefined[,]" making it impossible to determine if it is "limited to the type of regularly performed 'acts' by paid performers such as a Vaudville 'act' or [if] it include[s] within its sweep an 'act' between a husband and wife in a private room?" (Pls' Mem. at 26.) Plaintiffs also assert that the terms "consideration," "live," "conduct," "fondling," "similar establishment," "performance," and "non-obscene performance," among others, are undefined.

▆▆▆ As Defendant notes, however, the terms challenged by Plaintiffs as vague are either clear or are clarified when considered in context of § 23–54, other applicable ordinances, and common sense. For example, while the term "act" may not be independently defined in the statute, "live sex act" is plainly defined as "any act whereby one or more persons engage in a *live performance or live conduct* which contains sexual contact, oral sexual contact, or sexual intercourse." Phoenix, AZ Code § 23–54 (1998) (emphasis added). "Sexual contact," "oral sexual contact," and "sexual intercourse" are defined elsewhere in the statute. *Id.* Because the ordinance extends to "live conduct" in addition to "live performance[s]" it is clear that it is not limited to performances. In addition, though Plaintiffs assert that the location of the word "consideration" in the ordinance makes it unclear whether consideration is the payment to enter a business or the payment to a person in exchange for sexual contact with that person, (Pls' Mem. at 29), the definition of "consideration" elsewhere in § 23–54 makes it clear that the term refers to entrance or membership fees paid to the business. Finally, though Plaintiffs assert that the or-

dinance's definition of a live sex business could include hotels and apartment complexes, a person of reasonable intelligence reading the ordinance would conclude that such establishments are not covered. Courts are permitted to examine the " 'particular context' " in which legislation was enacted in order to determine if it is impermissibly vague. *Grayned,* 408 U.S. at 112, 92 S.Ct. 2294 (concluding that a statute was not unconstitutionally vague in part, because "it was written specifically for the school context"). The record is lacking any indication that the ordinance was intended to apply to hotels and apartment complexes, which establishments' primary purpose is not to provide a place to engage in sexual acts. In contrast, Plaintiffs' advertisements indicate that the primary lure of the clubs is to furnish patrons an opportunity to engage in or view live sexual acts.

Moreover, many of the terms or comparable terms used in the ordinance have withstood vagueness challenges or were taken from existing legislation. The definition of "sexual contact," for instance, was taken from an Arizona criminal statute, A.R.S. § 13–1401(2). The reference to "non-obscene" performances is supplemented by the Arizona obscenity statute, A.R.S. § 13–3501, which extensively defines obscenity adopting, virtually verbatim, the Supreme Court's requirements for obscenity regulations set forth in *Miller v. California,* 413 U.S. 15, 23–24, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973); *see also, IDK, Inc.,* 836 F.2d at 1198 (holding that a statute prohibiting escort services from operating in a "sexually oriented" manner or advertising in a manner that suggests to a "reasonable, prudent person that sexual stimulation or sexual gratification" will be provided was not unconstitutionally vague); *Kev, Inc. v. Kitsap County,* 793 F.2d 1053, 1057–58 (9th Cir.1986) (finding that a statute prohibiting erotic dancers from "caressing" and "fondling" patrons was not impermissibly vague); *Farkas,* 151 F.3d at 905 (finding that "persons of ordinary intelligence would not be confused as to the coverage of a statute's

'theater' exception, or to the meaning of the terms 'simulated sex act,' 'public performance,' or 'allows or permits' "); *Dodger's Bar & Grill v. Johnson Cty. Bd. of Com'rs,* 32 F.3d 1436, 1444–45 (10th Cir. 1994) (holding that a statute prohibiting acts simulating sexual intercourse and caressing and fondling the breast and buttocks was not unconstitutionally vague). Additionally, in *Stansberry v. Holmes,* 613 F.2d 1285, 1290 (5th Cir.1980), the Fifth Circuit found that use of examples of "sexually oriented commercial enterprise[s]" followed by the phrase "any other similar establishment," included in the instant ordinance, made the legislation less vague than it might otherwise have been. In holding that the legislation was sufficiently definite, the court noted:

> Additional definiteness is provided by the fact that the section specifically lists three types of regulated businesses— massage parlors, nude studios, and love parlors—and applies the definition to "any other similar commercial enterprise." We find that this definition is sufficiently clear and provides adequate warning of the proscribed conduct.

*Id.* (emphasis added); *U.S. v. Lacy,* 119 F.3d 742, 748 (9th Cir.1997) (noting two principles of statutory interpretation: " 'that a word is understood by the associated words' " and " 'that a general term following more specific terms means that the things embraced in the general term are of the same kind as those denoted by the specific terms' ") (citation omitted).

As the Supreme Court has noted, "[i]t will always be true that the fertile legal imagination can conjure up hypothetical cases in which the meaning of [disputed] terms will be in nice question.' " *Grayned,* 408 U.S. at 110 n. 15, 92 S.Ct. 2294 (citation omitted). Plaintiffs have engaged in such creative thinking, but the Court is unconvinced that a person of ordinary intelligence would not be able to determine how to conform his or her conduct to the ordinance. Accordingly, Plaintiffs' vague-

ness challenge is without merit and will be dismissed.

## Freedom of Expression

■ Plaintiffs' primary claim is that the conduct that occurs within the social clubs constitutes expression protected by the First Amendment and that the ordinance's attempt to regulate it is constitutionally infirm. Plaintiffs bear the burden of establishing that the First Amendment is implicated by § 23–54. *Las Vegas Nightlife, Inc. v. Clark County, Nevada*, 38 F.3d 1100, 1102 (9th Cir.1994) The Supreme Court has recognized that conduct with an expressive component may be entitled to First Amendment protection. *United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). However, the Court has specifically rejected "the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." *Id.* at 376, 88 S.Ct. 1673.

In *Spence v. State of Washington*, 418 U.S. 405, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974), a case heavily relied on by Plaintiffs, the Supreme Court set forth the test for determining when conduct constitutes expression protected by the First Amendment. The Court considered whether a college student's inverted display in his window of a privately owned United States flag with a peace symbol affixed to it was constitutionally protected activity. *Id.* at 408, 94 S.Ct. 2727. The student testified that his actions expressed his belief that " 'America stood for peace[,]' " a view that was particularly significant in light of the recent shootings at Kent State and the United States invasion of Cambodia. *Id.* Given the political context in which the conduct occurred, the Court concluded that "[a]n intent to convey a particularized message was present, and in the surrounding circumstances the likelihood was great that the message would be understood by those who viewed it." *Id.* at 410–411, 94 S.Ct. 2727. The Court concluded that the conduct constituted protected expression because "it would have been difficult for the great majority of citizens to miss the drift of appellant's point at the time that he made it." *Id.* at 410, 94 S.Ct. 2727.

Courts have extended constitutional protection to a variety of forms of symbolic conduct expressing political or other ideas. *Clark v. Community For Creative Non–Violence*, 468 U.S. 288, 104 S.Ct. 3065, 82 L.Ed.2d 221 (sleeping in a park adjacent to the White House as part of a demonstration against homelessness); *O'Brien*, 391 U.S. at 376, 88 S.Ct. 1673 (burning one's draft card); *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) (wearing black armbands). However, the Supreme Court has also emphasized that the First Amendment protection afforded to conduct in general has its limits. In *Dallas v. Stanglin*, 490 U.S. 19, 25, 109 S.Ct. 1591, 104 L.Ed.2d 18 (1989), the Court rejected a First Amendment challenge to an ordinance that restricted dance halls to teenagers of a particular age group. As the Court concluded:

> 'freedom of speech' means more than simply the right to talk and to write. It is possible to find some kernel of expression in almost every activity a person undertakes—for example, walking down the street or meeting one's friends at a shopping mall—but such a kernel is not sufficient to bring the activity within the protection of the First Amendment.

*Id.*

Plaintiffs argue that by engaging in sexual acts, members are expressing "a message of social and sexual liberation to other members of the Club as well as a message of love, trust, and honesty in their relationship to each other and to other members of the Club[.]" (ACLU Mem. at 3.) Relying primarily on *Spence*, Plaintiffs argue that club members engaging in sexual activity in the clubs uniformly intend to convey a particularized message and that there is a substantial likelihood the message will be understood by those viewing the activity. 418 U.S. at 410–411, 94 S.Ct. 2727. Several Plaintiffs selected by coun-

sel to offer testimony to the Court recited counsel's characterization of the message of those engaging in sexual activity in the clubs. Witnesses asserted that by engaging in sexual activities in the clubs, they were expressing their love for and trust in their partners and their belief in a sexually liberated society.[10] (R. Reedy Dep. at 11, 22–23; W. Brigham Test. at 39; M. Fencl Dep. at 15; West Dep. at 20.) However, many of the repeated characterizations of sexual conduct as "expression" appear to be the product of scrupulous coaching by Plaintiffs' counsel.[11] Moreover, not every witness confirmed Plaintiffs' counsel's assertion that those engaging in sexual acts intended to convey a particularized message and that the message had a substantial likelihood of being uniformly understood, even by those who viewed the act within the confines of the club.[12] In one deposition, the following exchange took place:

> Q: Have you ever seen two people have sexual intercourse on the club premises while the club was open to the public?
>
> A: Yes.

Q: Do you recall if you heard any message coming from them at that time?

A: You mean like moaning?

Q: That. Anything?

A: Sure. Lots of moaning.

Q: Did you get any other message coming from—

A: They are having a great time. They are enjoying themselves.

(J. Van Brunschot Dep. at 18–19.) The member was also asked if he could recall if he received any message from watching couples have sexual intercourse at a social club and he responded:

> A: I found it very exciting.
>
> Q: Could you identify any particular message they would have been sending to you as another patron?
>
> A: You know, I really wasn't thinking about messages. I was thinking about my excitement at the time.

(J. Van Brunschot Dep. at 34.) The following exchange took place at the deposition of a club owner Plaintiff who had

---

**10.** The "swinging philosophy" apparently may include the belief that having sex with someone outside a committed relationship conveys a message of love for and trust in the partner in the relationship. (R. Reedy Dep. at 22–23.) As one club member stated, "you have to have the trust within your own relationship to allow sexual relations where they're not usually allowed[.]" (W. Brigham Test. at 39.)

**11.** In one deposition, a club member stated: "I guess people are sexually inhibited and [it] ... seemed like you ... or some people have a problem with it." When Defendant's counsel asked "What is the 'it'?", Plaintiffs' counsel interrupted and offered: "Expression?" The witness dutifully responded: "[E]xpression, you know." (West Dep. at 17.) In another deposition, when asked what message a club member was sending by having sex with his wife in the club, he responded that the message was that he "enjoy[s] doing it." (J. Van Brunschot Dep. at 29.) When asked again if he was sending an particular message to any members, he responded: "Just my—It was my—" at which point, counsel for Plaintiffs interjected: "Were you letting her know you love her?" (*Id.*) In addition, while the form affidavits emphasize the alleged expres-

sive element of the conduct, it appears that they were constructed and drafted by counsel. (G. Mutschler Dep. at 28–29, noting that he had seen the affidavit he signed, but that he "didn't go over it with a fine tooth comb.")

**12.** In *Spence*, the Court noted that the conduct constituted expression because the message was likely to be understood by "the *great majority of citizens* [,]" rather than a great majority of those passing by the student's apartment, suggesting that in order for conduct to constitute expression, the relevant message may be required to be understood by the public as a whole rather than merely those viewing the message at the time it was sent or by a discrete group of persons. 418 U.S. at 410, 94 S.Ct. 2727 (emphasis added). If that is the standard, Plaintiffs would confront an even higher hurdle, because it is unlikely that a great majority of non-swingers would understand the message they claim to be sending by engaging in sexual conduct in the clubs. For purposes of this discussion, however, the Court will assume without deciding that the relevant audience is club patrons.

joined at least one additional club as a member:

Q: Focusing now, just on those members that are engaged in some form of sexual activity, can you explain to me what message it is they are sending?

A: I think you'd have to ask them what message that they are sending. That would be a question that they would have to give you.

Q: Is there any way for someone who is viewing two people having sexual relations to determine the message that that couple may be sending?

A: I think the person receiving that message, the way they would receive it would be in a form that they could only explain. I can not say what this person would feel by the message that they would be receiving from watching somebody else having sex or whatever they might be doing.

Q: What I'm trying to get at—and I'll give you one more chance, what I'm trying to get at is whether or not the person watching is able to ascertain the message which is being sent by the two individuals copulating?

A: That would be speculative on my part. Again I can't state what those people are giving or receiving.

(G. Mutschler Dep. at 12–13.) When asked if there was any way for someone outside of one of the private rooms to determine what message was being sent from someone inside a private room, the owner responded: "I guess you'd have to ask that person that's on the outside of the room what message they are receiving. I have no idea." (G. Mutschler Dep. at 24.) The deposition continued:

Q: Can you tell me if you, yourself, send a message of social or sexual liberation to [your partner] at any time?

A: I would assume that I'm sending the same message to [my partner] that you might be sending to your wife when you're having a sexual relationship with her or girlfriend.

Q: Do you ever send a message to [your partner] or have you ever sent a message to [her] by having sexual relations with someone other than her?

A: Yes. But what that message would have been at that time, I can't recall.

(G. Mutschler Dep. at 32.) Still later in the deposition, the owner was asked to define the "swinging lifestyle." He responded as follows:

A: A community of people enjoying one another's company at a private social club or at a private residence.

Q: That's pretty broad, isn't it?

A: Yes.

Q: That would include literally every private party held in the [Phoenix area] every weekend night, wouldn't it?

A: That could be a swinging lifestyle of sorts, sure. Again, it's up to the people what they want to do.

Q: I guess what I'm asking you is, if the term is defined that broadly, it most has no meaning because what you've told me is that the swinging lifestyle is social gatherings; is it that broad?

A: The swinging lifestyle is a social gathering.

Q: But it's more than that, isn't it?

A: It can be whatever it wants to be. People can do whatever they want to do. If I come to your home and ... my girlfriend and your girlfriend or wife, we go swimming in the pool, we observe you participating in some sort of activity, I could say that's the swinging lifestyle and neither has an objection to anyone. The swinging lifestyle means many things to many persons. To you folks it means sex clubs.

(G. Mutschler Dep. at 17–18.) Some Plaintiffs assert their beliefs that every act of sexual or oral intercourse is an expressive act conveying the same message when conducted in a social club as it does when conducted in a private hotel room. (W. Markus Dep. at 57; West Dep. at 29.) According to one witness, the message club members communicate is "[t]hat we care about ourselves, that we care about the other people, that we are interested in

spending time with them." (W. Brigham Dep. at 15.)

As Plaintiffs' own testimony reveals, however, the message being sent by those engaging in sexual conduct in the clubs is not a particularized message guaranteed to be consistently interpreted and understood by the "great majority" of those who view it. *Spence*, 418 U.S. at 410, 94 S.Ct. 2727. Although some Plaintiffs claim to express a view of a sexually liberated society, others stated that it was impossible to determine the message being sent and that the message varied depending on who interpreted it. (G. Mutschler Dep. at 33, noting that "[i]t's really up to you what message you would receive by being at the club.") Still other Plaintiffs admitted that the message they intended to convey by engaging in sexual conduct or that they interpreted by viewing it was one of sexual arousal or enjoyment. Significantly, the testimony is not from randomly selected patrons who might have visited the club only once out of curiosity, but from Plaintiffs after consultation with counsel and initiation of this lawsuit. Although expressions of sexual arousal and enjoyment may be a communication of a sort, they are not, without more, entitled to constitutional protection. *Ellwest Stereo Theatres, Inc. v. Wenner*, 681 F.2d 1243, 1248 (9th Cir. 1982) (noting that "[w]hile we certainly agree with [an adult theater owner] that its customers have a constitutional right to view its films, we cannot agree that the interest in simultaneously engaging in sexual activity is similarly protected.") Although erotic dancing is protected under the First Amendment, members of the audience have no corresponding First Amendment right to touch a nude dancer or be touched by a nude dancer. *Hang On, Inc. v. City of Arlington*, 65 F.3d 1248, 1253 (5th Cir.1995). Certainly, an observer's act of touching a nude dancer may be substantially likely to be understood by those viewing it as an indication that the individual was sexually attracted to the dancer and enjoying the performance. However, as the Fifth Circuit recently noted:

intentional contact between a nude dancer and a bar patron is conduct beyond the expressive scope of the dancing itself. The conduct at that point has overwhelmed any expressive strains it may contain. That the physical contact occurs while in the course of protected activity does not bring it within the scope of the First Amendment.

*Id.*

Other courts considering the issue of whether sexual acts are entitled to First Amendment Protection have commonly agreed that there is no First Amendment protection for physical sexual conduct. In *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 224, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990), the Supreme Court considered a First Amendment challenge brought by a variety of sexually oriented businesses, including adult bookstores, video stores, cabarets, motels, and theaters, as well as escort agencies, nude model studios, and "sexual encounter centers." Although the Supreme Court did not focus on sexual encounter centers or describe the activities alleged to take place within them, the Court summarily dismissed the notion that the centers might be entitled to First Amendment protection. *Id.* The Court noted that "[a]lthough the ordinance applies to some businesses that apparently *are not protected by the First Amendment*, e.g., escort agencies and *sexual encounter centers*, it largely targets businesses purveying *sexually explicit speech* which the city concedes for purposes of these cases are protected by the First Amendment." *Id.* (emphasis added). *FW/PBS* is perhaps a premonition of a Supreme Court decision squarely addressing whether mere sexual contact in a commercial club is prohibited by the First Amendment. *See also, Paris Adult Theatre*, 413 U.S. at 67, 93 S.Ct. 2628 (noting that "[c]onduct or depictions of conduct that the state police power can prohibit on a public street do not become automatically protected by the Constitution merely because the conduct is moved to a bar or a

'live' theater stage, any more than a 'live' performance of a man and woman locked in a sexual embrace at high noon in Times Square is protected by the Constitution because they simultaneously engage in a valid political dialogue"). In analyzing a First Amendment challenge brought by a publisher of magazines devoted to the swingers lifestyle, the Sixth Circuit recently noted, "the First Amendment also would not protect the right to engage in the depicted sexual conduct publicly under the theory that the sexual act itself constitutes protected expression." *Connection Distributing Co. v. Reno*, 154 F.3d 281, 289 n. 8 (6th Cir.1998). Similarly, in *People v. Morone*, 150 Cal.App.3d Supp. 18, 198 Cal.Rptr. 316, 317–18 (Ct.Super.1983), a California appeals court rejected an argument that sexual conduct as part of the swinging lifestyle was protected by the First Amendment. In affirming the criminal convictions of the owners of a health club in which sexual conduct occurred, the court held that "[t]he First Amendment, which protects both the freedom of speech and the freedom of association, does not embrace purely physical activity. 'Swinging,' which is a 'free heterosexual activity,' therefore does not per se qualify for First Amendment protection." *Id.* (citations omitted). The court concluded that "[t]o hold otherwise would require us to adopt the already discredited 'view that an apparently limitless variety of conduct can be labeled "speech" whenever the person engaging in the conduct intends thereby to express an idea.'" (*Id.*) (quoting *O'Brien,* 391 U.S. at 376, 88 S.Ct. 1673).

■■■ This Court concludes that sexual conduct as it is defined in § 23–54 does not constitute expression within the meaning of the First Amendment. The conclusion that the sexual acts themselves do not merit constitutional protection does not end the inquiry. Although the advertisements for Plaintiffs' clubs suggest that sexual activity is the primary attraction, Plaintiffs have testified that the clubs perpetuate a social philosophy of untrammeled sexual contact between consenting adults and provide members a place where they can engage in discussion of the swinging lifestyle and observe and participate in erotic dancing. As noted above, the Supreme Court has held that nude or partially nude dancing performances are "marginally" protected by the First Amendment. *Barnes,* 501 U.S. at 566, 111 S.Ct. 2456. However, the Supreme Court has also made clear that dancing which is not part of a performance warrants no First Amendment protection. *Id.* at 581, 111 S.Ct. 2456 (Souter, J. concurring) (noting that while not all dancing is entitled to First Amendment protection, "dancing as a performance directed to an actual or hypothetical audience" does warrant constitutional protection). Thus, to the extent that the dancing that takes place within the clubs is recreational rather than part of a performance, it warrants no First Amendment protection. *Dallas,* 490 U.S. at 24, 109 S.Ct. 1591 (holding that merely "coming together to engage in recreational dancing" is not protected by the First Amendment). However, because Plaintiffs have testified that the clubs offer cage dancing, dancing poles, and striptease dance contests and that patrons come to the clubs, in part, to watch others dance, the Court assumes some of the dancing in question constitutes "marginally" constitutionally protected expressive conduct. *Barnes,* 501 U.S. at 566, 111 S.Ct. 2456. Similarly, though Plaintiffs' advertisements make no mention of the clubs as a forum for discussion of social philosophies, the Court will assume because of some of Plaintiffs' testimony that certain patrons do discuss opinions of a sexually liberated society at the clubs and that these conversations are entitled to First Amendment protection.

The Supreme Court has applied First Amendment scrutiny to enactments "regulating conduct which has the incidental effect of burdening the expression of a particular political opinion." *Arcara v. Cloud Books, Inc.,* 478 U.S. 697, 702, 106 S.Ct. 3172, 92 L.Ed.2d 568 (1986). In such cases, "a sufficiently important government interest in regulating the nonspeech

element can justify incidental limitations on First Amendment freedoms." *O'Brien,* 391 U.S. at 376, 88 S.Ct. 1673. According to the test in *O'Brien:*

> a government interest is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial government interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of the interest.

*Id.* The Supreme Court has applied the *O'Brien* test in cases involving regulations of conduct containing an expressive element, such as homeless advocates who sought to sleep in the park across from the White House as a sign of protest. *Arcara,* 478 U.S. at 703–4, 106 S.Ct. 3172 (citing *Clark,* 468 U.S. at 288, 104 S.Ct. 3065). The Court has also applied *O'Brien* to "statutes which, although directed at activity with no expressive component, impose a disproportionate burden upon those engaged in protected First Amendment activities" such as taxes on the sale of newsprint and ink. *Arcara,* 478 U.S. at 704, 106 S.Ct. 3172 (citing *Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue,* 460 U.S. 575, 103 S.Ct. 1365, 75 L.Ed.2d 295 (1983)).

In cases not involving such regulations, the Court has held that incidental burdens on constitutionally protected expression are not subject to First Amendment protections. Significantly, in *Arcara,* the Supreme Court held that the First Amendment did not preclude the closing of an adult bookstore when it was determined that solicitation of prostitution, masturbation, and sexual activity between patrons was occurring on the premises. 478 U.S. at 705–6, 106 S.Ct. 3172. The Supreme Court specifically rejected the argument "that the statutory closure requirement impermissibly burdens [the plaintiff's] First Amendment protected bookselling activities," because the sexual activity that led to the closure of the bookstore was unprotected by the First Amendment. *Id.* The Court concluded:

> The severity of this burden is dubious at best, and is mitigated by the fact that respondents remain free to sell the same materials at another location. In any event, this argument proves too much, since every civil and criminal remedy imposes some conceivable burden on First Amendment protected activities.... [W]e have not traditionally subjected every criminal and civil sanction imposed through legal process to 'least restrictive means' scrutiny simply because each particular remedy will have some effect on the First Amendment activities of those subject to sanction. Rather, we have subjected such restrictions to scrutiny *only where it was conduct with a significant expressive element that drew the legal remedy in the first place,* as in *O'Brien,* or where a statute based on a nonexpressive activity has the inevitable effect of singling out those engaged in expressive activity.... This case involves neither situation, and we conclude the First Amendment is not implicated by the enforcement of a public health regulation of general application against the physical premises in which respondents happen to sell books.

*(Id.)* (emphasis added).

The Court agrees that § 23–54 is governed by the same First Amendment scrutiny. As in *Arcara,* the conduct which drew the legal remedy—sexual activity occurring in clubs meeting the definition of live sex acts businesses—does not have "a significant expressive element." *Id.* Nor does the ordinance single out those engaging in protected expressive activity as would a tax on newsprint. *Minneapolis Star,* 460 U.S. at 575, 103 S.Ct. 1365. The ordinance places no express restriction on erotic dancing performances or discussion of the sexual mores of the swinging lifestyle; devotees of this lifestyle are free to engage in such activities anywhere including social clubs provided that the clubs do not allow persons to engage in the sexual conduct proscribed by the ordinance. Ac-

cordingly, the Court finds that § 23–54 is not proscribed by the First Amendment.

Assuming enforcement of the ordinance is subject to First Amendment scrutiny, however, it survives the *O'Brien* test. Section 23–54 is clearly within Defendant's police power, satisfying the first prong of the *O'Brien* test. The ordinance also furthers an important or substantial government interest of slowing the spread of sexually transmitted diseases. Although Plaintiffs assert that they encourage their patrons to use condoms, they acknowledge that this requirement is not enforced. Defendant offered evidence that undercover police officers who observed sexual acts taking place at the social clubs noted the absence of condom use. It is well-established that failure to use condoms during sexual activity increases the transmission of sexually transmitted diseases including HIV/AIDS, an undeniable public health concern. *Doe v. City of Minneapolis*, 898 F.2d 612, 619 (8th Cir.1990); *City of New York v. New Saint Mark's Baths*, 130 Misc.2d 911, 912–914, 497 N.Y.S.2d 979 (N.Y.1986). With respect to the third prong of the *O'Brien* test, the governmental interest of curtailing the spread of sexually transmitted disease is unrelated to the suppression of free expression. *Colacurcio v. City of Kent*, 163 F.3d 545, 551 (9th Cir.1998) (noting that the regulation is deemed to be unrelated to suppression of expression if it is " 'aimed to control secondary effects resulting from the protected expression,' rather than at inhibiting the protected expression itself"). Finally, regarding the fourth factor in *O'Brien*, the Supreme Court has held that "an incidental burden on speech is no greater than is essential, and therefore is permissible under *O'Brien*, so long as the neutral regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *U.S. v. Albertini*, 472 U.S. 675, 689, 105 S.Ct. 2897, 86 L.Ed.2d 536 (1985). Given the prevalence of high risk sexual activity in the clubs and the failure to

enforce the use of condoms, the government's interest in limiting the transmission of sexually transmitted diseases would be achieved less effectively absent the ordinance. The ordinance survives the *O'Brien* test even if it were applied.

Plaintiffs also claim that in exempting the "non-obscene presentation, showing, or performance of any play, drama, or ballet in any theater, concert hall, fine arts academy, school, institution of higher education, or similar establishment[,]" § 23–54 constitutes an invalid regulation of obscenity. "It is settled that obscene materials are not protected speech within the meaning of the first amendment." *Ellwest*, 681 F.2d at 1245. However, "[s]tate statutes designed to regulate obscene materials must be carefully limited." *Miller*, 413 U.S. at 23–24, 93 S.Ct. 2607. If an obscenity statute prohibits the depiction or description of sexual conduct, "[t]hat conduct must be specifically defined by the applicable state law, as written or authoritatively construed." *Id.* at 24, 93 S.Ct. 2607. While § 23–54 does not define obscenity, A.R.S. § 13–3501 extensively defines "obscenity," adopting, virtually verbatim, the Supreme Court's requirements regulating obscenity set forth in *Miller*, 413 U.S. at 24, 93 S.Ct. 2607. Courts have filled in statutory gaps by relying on definitions found elsewhere within a statutory scheme or prior judicial determinations. *Information Providers' Coalition v. F.C.C.*, 928 F.2d 866, 874 (9th Cir.1991) (noting that the word " 'indecent' has a judicially recognized meaning"). Given that state law defines obscenity according to the requirements set forth in *Miller*, the ordinance is "carefully limited" and meets the requirements for an obscenity regulation. 413 U.S. at 24, 93 S.Ct. 2607.

Accordingly, Plaintiffs' motion to enjoin the ordinance because of its alleged infringement of Plaintiffs' First Amendment right to engage in expression is without merit.[13] Because this conclusion was

**13.** Plaintiffs' First Amendment challenge also includes arguments that the ordinance should

be enjoined as a prior restraint. However,

reached upon consideration of Plaintiffs' depositions, advertisements, and in-court testimony, Defendant's motion to dismiss this claim is also denied.

### Freedom of Association

The Ninth Circuit has noted, "[t]he freedom of association substantially overlaps with the right of privacy." *Fleisher v. City of Signal Hill*, 829 F.2d 1491, 1499 (9th Cir.1987). The seminal case involving freedom of association rights in the context of a membership organization is *Roberts v. United States Jaycees*, 468 U.S. 609, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984). There, the Supreme Court considered whether a law prohibiting discrimination on the basis of gender in places of public accommodation abridged the associational rights of members of a private club. *Id.* The Court noted two lines of freedom of association decisions, one addressing the "right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends" and the other reflecting the premise that "the choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State." *Id.* at 622, 618, 104 S.Ct. 3244.

#### 1. Freedom of Intimate Association

 As the Ninth Circuit has noted, "the freedom of intimate association is co-extensive with the right of privacy; both the freedom of intimate association and the right of privacy describe that body of rights that protect intimate human relationships from unwarranted intrusion or interference by the state." *Fleisher*, 829 F.2d at 1500. In *Roberts*, the Supreme Court identified the kinds of intimate relationships afforded constitutional protection. 468 U.S. at 619–620, 104 S.Ct. 3244. According to the Court, these relationships include:

those that attend the creation and sustenance of a family—marriage, childbirth, the raising and education of children, and cohabitation with one's relatives. Family relationships, by their nature, involve *deep attachments and commitments to the necessarily few other individuals* with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctly personal aspects of one's life. Among other things, therefore, they are distinguished by such attributes as *relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others* in critical aspects of the relationship. As a general matter, only relationships with these sorts of qualities are likely to reflect the considerations that have led to an understanding of freedom of association as an intrinsic element of personal liberty.

*Id.* at 619–620, 104 S.Ct. 3244 (citations omitted) (emphasis added). The Supreme Court rejected the argument that the Jaycees fostered such associations, noting that the chapters, which had approximately 400 members, were "large and basically unselective groups." *Id.* at 621, 104 S.Ct. 3244. "Apart from age and sex," the Court noted, "neither the national organization nor the local chapters employ any criteria for judging applicants for membership, and new members are routinely recruited and admitted with no inquiry into their backgrounds." *Id.* Based on these factors, the Court concluded that the Jaycees chapters "lack the distinctive characteristics that might afford constitutional protection" to their activities. *Id.* at 621–622, 104 S.Ct. 3244. Two years later, the Court similarly rejected a claim by a consortium of private clubs arguing that the club members' freedom to engage in intimate association was impermissibly infringed by an anti-dis-

---

enactments only constitute prior restraints when they "g[i]ve public officials the power to deny use of a forum in advance of actual expression." *Southeastern Promotions Ltd. v. Conrad*, 420 U.S. 546, 553, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975); *Arcara*, 478 U.S. at 705

n. 2, 106 S.Ct. 3172. That is not the case here, where a club would be subject to closure only after violations of the ordinance were found to have occurred. Phoenix, AZ Code § 23–54 (1998).

crimination ordinance. *New York State Club Assoc. v. City of N.Y.*, 487 U.S. 1, 12, 108 S.Ct. 2225, 101 L.Ed.2d 1 (1988). The Court initially noted that the clubs covered under the law contained at least 400 members, approximately the same number as was considered too large to implicate freedom of intimate association in *Roberts*. *Id.* (citing *Roberts*, 468 U.S. at 621, 104 S.Ct. 3244). The Court concluded: "It may well be that a considerable amount of private or intimate association occurs in such a setting, as is also true in many restaurants and other places of public accommodation, but that fact alone does not afford the entity as a whole any constitutional immunity" to government regulation. *Id.*

The Ninth Circuit rejected a freedom of intimate association challenge to an enactment regulating escort services on concomitant grounds. As the Ninth Circuit noted:

> While we may assume that the relationship between [an escort and a client] is cordial and that they share conversation, companionship, and the other activities of leisure, we do not believe that a day, an evening, or even a weekend is sufficient time to develop deep attachments or commitments. In fact, the relationship between a client and his or her paid companion may well be the antithesis of the highly personal bonds protected by the fourteenth amendment. These are not the ties that "have played a critical role in the culture and traditions of the Nation by cultivating and transmitting shared ideals and beliefs."

*IDK, Inc.*, 836 F.2d at 1193. Even assuming Plaintiffs' assertions regarding the expressive activities that take place within the social clubs are correct, they fall far short of the connections warranting protection as intimate associations under the Fourteenth Amendment. Accordingly, Plaintiffs' claim that the ordinance violates their freedom to engage in intimate associations will be denied.

### 2. Freedom of Expressive Association

As the Supreme Court held, "implicit in the right to engage in activities protected by the First Amendment [is] a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts*, 468 U.S. at 622, 104 S.Ct. 3244. Nonetheless, the First Amendment "does not protect every communication or every association that touches these topics." *IDK, Inc.*, 836 F.2d at 1194. As noted above, the sexual conduct proscribed by the ordinance does not constitute expression protected by the First Amendment. In addition, the clubs' advertisements make no reference to the clubs as intellectual salons organized for discourse on or advocacy of a sexually liberated society. *Id.* at 1195 (rejecting freedom of expressive association claim, in part, because the advertisements of escort services "do not tout their employees' skills in conversation, advocacy, teaching, or community service"). Whatever constitutionally protected expression might occur on the premises of the clubs would not be impermissibly infringed by the ordinance, which imposes no limits on advocates of the swinging lifestyle meeting, dancing, and exchanging political and social views. In addition, the ordinance does not prohibit members from engaging in the sexual activities that are associated with the swinging philosophy in their homes or possibly even in clubs that are truly private. Accordingly, the ordinance does not impermissibly infringe on Plaintiffs' freedom to engage in expressive association and cannot be enjoined on this basis. Because the Court relied on the factual record in reaching this conclusion, Defendant's motion to dismiss is denied with respect to this claim.

### Equal Protection

Plaintiffs assert that the ordinance denies them equal protection because other businesses which may also contribute to the spread of sexually trans-

mitted diseases and prostitution were not targeted by § 23–54. Plaintiffs do not claim to be members of a suspect class, but they argue that the law is subject to strict scrutiny because it impinges on fundamental rights of privacy, association, and speech. *City of Cleburne, Tex. v. Living Center,* 473 U.S. 432, 440, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). As noted above, however, Plaintiffs have failed to establish that the ordinance would violate any of these fundamental rights. The ordinance would therefore be subject only to a rational basis test, a level of scrutiny it clearly withstands. This is particularly true because "mere underinclusiveness is not fatal to the validity of a law under the equal protection [clause] even if the law disadvantages an individual or identifiable members of a group." *Nixon v. Administrator of General Services,* 433 U.S. 425, 471 n. 33, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977). As the Supreme Court has held, "reform may take one step at a time, addressing itself to the phase of the problem most acute to the legislative mind." *Williamson v. Lee Optical of Oklahoma, Inc.,* 348 U.S. 483, 489, 75 S.Ct. 461, 99 L.Ed. 563 (1955); *Hang On Inc.,* 65 F.3d at 1256. Because Plaintiffs' equal protection challenge is without merit, Defendant's Motion to Dismiss will be granted on this claim.

### Bill of Attainder

■■■■ Plaintiffs also allege that § 23–54 constitutes an unconstitutional bill of attainder. " '[L]egislative acts, no matter what their form, that apply either to named individuals or to easily ascertainable members of a group in such a way as to inflict punishment on them without a judicial trial are bills of attainder prohibited by the Constitution." *United States v. Brown,* 381 U.S. 437, 448–49, 85 S.Ct. 1707, 14 L.Ed.2d 484 (1965), *United States v. Munsterman,* 177 F.3d 1139 (9th Cir. 1999). In order to establish that a statute is a bill of attainder, a challenger must establish "specification of the affected persons, punishment, and lack of a judicial trial." *Selective Serv. Sys. v. Minnesota*

*Pub. Interest Research Group,* 468 U.S. 841, 847, 104 S.Ct. 3348, 82 L.Ed.2d 632 (1984). Plaintiffs assert that the ordinance constitutes a bill of attainder because Defendant drafted the ordinance in response to activities that were allegedly taking place in their clubs. However, the ordinance is merely a generally applicable law proscribing a specified type of conduct. It does not mention Plaintiffs by name, nor does it limit its application to Plaintiffs or deny them the opportunity to conform their conduct to the new ordinance. The ordinance is thus markedly different from statutes found to constitute bills of attainder. *See, e.g., United States v. Lovett,* 328 U.S. 303, 106 Ct.Cl. 856, 66 S.Ct. 1073, 90 L.Ed. 1252 (1946) (concluding that an appropriations bill that prohibited compensation to three named federal employees constituted a bill of attainder). In *Brown,* for example, the Supreme Court considered the constitutionality of a statute that made it a crime for members of the Communist Party to serve as officers of labor unions. 381 U.S. at 450, 85 S.Ct. 1707. In invalidating the law as an unconstitutional bill of attainder, the Court noted:

> [t]he statute does not set forth a generally applicable rule decreeing that any person who commits certain acts or possesses certain characteristics (acts and characteristics which, in Congress' view, make them likely to initiate political strikes) shall not hold union office, and leave to courts and juries the job of deciding what persons have committed the specified acts or possess the specified characteristics. Instead, it designates in no uncertain terms the persons who possess the feared characteristics and therefore cannot hold union office without incurring criminal liability-members of the Communist Party.

*Id.* Because § 23–54 is a generally applicable law which proscribes a specified type of conduct, it is clearly distinguishable from the kind of legislation the Supreme Court confronted in *Brown.* Accordingly, Defendant is entitled to dismissal of Plaintiffs' bill of attainder claim.

*Taking*

 Plaintiffs have also brought facial and as applied takings claims against Defendant, asserting that the ordinance constitutes an unconstitutional regulatory taking in violation of the Fifth Amendment to the United States Constitution. A land use regulation "effects a taking if it does not substantially advance legitimate state interests or denies an owner economically viable use of his land." *Agins v. City of Tiburon,* 447 U.S. 255, 260, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980) (citations omitted). In *Williamson County Regional Planning Commission, et al. v. Hamilton Bank of Johnson City,* 473 U.S. 172, 186, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985), the Supreme Court clarified the standard for ripeness of an as applied challenge to a regulation, noting that such a claim "is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." In addition, "because the Fifth Amendment does not prohibit all takings, but merely takings unaccompanied by just compensation, an as applied challenge is unripe unless the plaintiff has sought 'compensation through the procedures the State has provided for doing so.'" *Sinclair Oil Corp. v. County of Santa Barbara,* 96 F.3d 401, 405 (9th Cir.1996) (quoting *Williamson County,* 473 U.S. at 194, 105 S.Ct. 3108). Plaintiffs do not assert that Defendant has reached a final determination that any or all of the clubs are operating in violation of the ordinance or that they have sought compensation through state procedures. Accordingly, Plaintiffs' as applied challenge to § 23–54 is not ripe.

 Plaintiffs' facial claim rests on their assertion that the "mere enactment" of the ordinance constitutes an uncompensated taking. *Suitum v. Tahoe Regional Planning Agency,* 520 U.S. 725, 117 S.Ct. 1659, 1666 n. 10, 137 L.Ed.2d 980 (1997); *Southern Pacific v. City of Los Angeles,* 922 F.2d 498, 505 (9th Cir.1990). As noted above, a facial takings challenge can proceed on two theories: that the ordinance fails to substantially advance legitimate state interests, or that it deprives the landowner of the economically viable use of the land. *Agins,* 447 U.S. at 260, 100 S.Ct. 2138; *Sinclair Oil,* 96 F.3d at 405. In assessing whether the ripeness requirements for as applied challenges set forth in *Williamson County* apply to facial claims, the Ninth Circuit has held that the "finality" requirement does not apply in the facial context. *Sinclair Oil,* 96 F.3d at 406. However, the Ninth Circuit has extended the *Williamson County* "just compensation" requirement to facial takings claims alleging that a regulation has denied a plaintiff the economically viable use of his land. *Id.* Thus, a plaintiff claiming loss of all economic viability from mere enactment of the ordinance must seek compensation through the state procedures prior to bringing a takings claim in federal court. Plaintiffs argue, in part, that the enactment of § 23–54 has denied them all economically viable use of their property, but they have not asserted that they have sought compensation though the state procedures prior to filing this lawsuit. Accordingly, Plaintiffs' facial challenge based on loss of economic viability is not ripe.

 However, Plaintiffs offer an additional argument in support of their facial takings claim: that, regardless of how the ordinance is applied, it fails to "substantially advance legitimate [City] interests[.]" *Agins,* 447 U.S. at 260, 100 S.Ct. 2138. Because this allegation does not turn on the extent to which just compensation is available through state remedies, Plaintiffs' challenge based on the ordinance's alleged failure to substantially advance a legitimate state interest is ripe. *Yee v. City of Escondido, Cal.,* 503 U.S. 519, 534, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992); *The San Remo Hotel v. City and County of San Francisco,* 145 F.3d 1095, 1102 (9th Cir.1998); *Sinclair Oil,* 96 F.3d at 407 (noting that "the just compensation ripeness requirement does not apply to 'legitimate state interest' facial taking claims").

Plaintiffs assert that

the record before the [Phoenix City] Council was devoid of any evidence that sexually transmitted diseases are actually 'spread' in Social Clubs or that the public 'health, safety, general welfare and morals' are negatively affected by either the expressive activity engaged in at the Social Clubs or the mere operation of such clubs. It is apparent, therefore, that the Defendant will not be able to establish 'causation'; that is, the alleged harms sought to be alleviated are caused by Social Clubs and their member[s]. Since the Defendant can not prove 'causation', it is clear that the Defendant will not be able to meet its burden to demonstrate that Section 23–54 'substantially advance[s] legitimate state interests.'

(Pls' Mem. at 55.) Plaintiffs' argument is flawed for several reasons. First, Plaintiffs erroneously assert that Defendant bears the burden of establishing that the ordinance substantially advances legitimate state interests. As the case law makes clear, that burden falls squarely on Plaintiffs. *Christensen v. Yolo County Board of Supervisors,* 995 F.2d 161, 165 (9th Cir.1993). Second, Plaintiffs fail to offer any support for their assertion that the relevant inquiry is one of causation. In fact, the standards for assessing whether an enactment substantially advances a legitimate public purpose are undefined and appear to afford considerable deference to the determinations of the legislative body.[14] As the Supreme Court noted:

> [o]ur cases have not elaborated on the standards for determining what constitutes a "legitimate state interest" or what type of connection between the regulation and the state interest satis-

fies the requirement that the former "substantially advance" the latter. They have made clear, however, that a broad range of governmental purposes and regulations satisfies these requirements. *Nollan,* 483 U.S. at 834, 107 S.Ct. 3141; *see also, Christensen,* 995 F.2d at 165 (concluding, without discussion, that "Plaintiffs have failed to demonstrate that [the asserted purposes] are not legitimate state interests or that the [challenged regulation] does not substantially advance them"). In *Nectow v. City of Cambridge,* 277 U.S. 183, 187, 48 S.Ct. 447, 72 L.Ed. 842 (1928) which, while not a takings case, is the origin of the language repeated by courts in the first prong of the takings analysis, the Supreme Court made its deference to legislative judgment clear. The Court stated:

> a court should not set aside the determination of public officers in such a matter unless it is clear that their action 'has no foundation in reason and is a mere arbitrary or irrational exercise of power having no substantial relation to the public health, the public morals, the public safety or the public welfare in its proper sense.'

*Id.* (citation omitted). Other cases have suggested that an ordinance will be declared invalid only if it is predicated on impermissible objectives. As the Ninth Circuit noted, under some circumstances:

> no compensation would be sufficient to cure the constitutional infirmity. Some harms are "impermissible even if the government is willing to pay for them." "For example, even if the State is willing to compensate me, it has no right to appropriate my property because it does

---

**14.** The Supreme Court has provided some instruction to courts in determining whether an exaction—a land-use decision conditioning approval of development on the dedication of property to public use—fails to substantially advance legitimate public interests. *See, Dolan v. City of Tigard,* 512 U.S. 374, 385, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994) (requiring a "rough proportionality" between the exaction and the development's anticipated impacts); *Nollan v. California Coastal Comm'n,* 483 U.S. 825, 841, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987). However, the Court recently rejected the Ninth Circuit's application of the "rough proportionality" test in a takings claim not involving an exaction. *City of Monterey v. Del Monte Dunes,* 526 U.S. 687, 119 S.Ct. 1624, 1635, 143 L.Ed.2d 882 (1999) (noting that "we have not extended the rough-proportionality test of *Dolan* beyond the special context of exactions"). Accordingly, that test is inapplicable in the instant case.

not agree with my political or religious views."

*Southern Pacific,* 922 at 506 n. 11 (quoting *Williamson County,* 473 U.S. at 202, n.1, 105 S.Ct. 3108).

In the instant case, the ordinance's asserted purposes of combatting the transmission of sexually transmitted diseases and preserving societal order and morality are clearly legitimate public purposes. The legislative record indicates that undercover police officers witnessed dozens of individuals engaging in sexual intercourse and oral sex within the clubs, none of whom used condoms. The officers also noted that the employees of the clubs appeared to make no effort to ensure that condoms were used. It is common knowledge that engaging in sexual intercourse and oral sex without the use of condoms place people at risk for sexually transmitted diseases, including HIV/AIDS. It is also common knowledge that combating the spread of such diseases is a critical public health concern. *Doe v. Minneapolis,* 898 F.2d at 619; *New Saint Mark's Baths,* 130 Misc.2d at 912–914, 497 N.Y.S.2d 979. Plaintiffs have not met their burden of establishing that § 23–54 fails to substantially advance a legitimate public purpose. Accordingly, the ordinance will not be enjoined on the basis of their takings claim. Because the Court relied on the factual record in reaching this conclusion, Defendant's Motion to Dismiss is denied.

*The Eighth Amendment*

■ Plaintiffs also assert that § 23–54 constitutes an "excessive fine" in violation of the Eighth Amendment because businesses found to be operating in violation of the ordinance are subject to closure, a remedy Plaintiffs claim is excessive. The Supreme Court did not consider an application of the Excessive Fines Clause until 1989, when it rejected a claim that an award of punitive damages in a civil trial between private parties constituted an excessive fine within the meaning of the Eighth Amendment. *Browning–Ferris Industries of Vermont, Inc., et al. v. Kelco*

*Disposal, Inc.,* 492 U.S. 257, 268, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989). After engaging in lengthy historical analysis of the Excessive Fines Clause, the Court concluded that "the clause was intended to limit only those fines directly imposed by, *and payable to, the government." Id.* (emphasis added). More recently, the Court considered whether the Excessive Fines Clause applied to *in rem* civil forfeiture proceedings. *Austin v. United States,* 509 U.S. 602, 606, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993). While the Court concluded that the Excessive Fines Clause was not limited to criminal cases, it emphasized that the clause only limited "the government's power *to extract payments,* whether in cash or in kind, 'as *punishment* for some offense.' " *Id.* at 609–610, 113 S.Ct. 2801 (emphasis added); *see also, Hopkins v. Oklahoma Public Employees Retirement System,* 150 F.3d 1155, 1162 (10th Cir.1998) (noting that "[i]mplicit in [the Supreme Court's] interpretation of the Excessive Fines Clause is the notion that it applies only when the payment to the government involves turning over 'property' of some kind that once belonged to the defendant"). Plaintiffs have offered no authority for the notion that the Excessive Fines Clause applies to non-forfeiture civil cases in which the penalty is closure of a business rather than payment of fines to the government. Therefore, Plaintiffs' Eighth Amendment claim is without merit and will be dismissed.

Accordingly,

**IT IS ORDERED** that Plaintiffs' Motion for a Preliminary Injunction (Doc. 2) is denied.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion to Exceed the Page Limit (Doc. 3) is granted.

**IT IS FURTHER ORDERED** that Defendant's Motion to Dismiss (Doc. 6) is denied as moot.

**IT IS FURTHER ORDERED** that Defendant's Motion to Dismiss First·Amend-

ed Complaint (Doc. 29) is granted in part and denied in part.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Closed Hearing as to Certain Witnesses (Doc. 11), which was verbally denied at a hearing, is denied for the record.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Expedited Hearing on Plaintiffs' Motion for Protective Order and Order for Closed Hearing as to Certain Witnesses (Doc. 12), which was verbally granted at a hearing, is granted for the record.

**IT IS FURTHER ORDERED** that Defendant's Motion in Limine to Preclude Testimony of Witnesses Who are Patrons of Live Sex Act Businesses (Doc. 15), which was verbally denied at a hearing, is denied for the record.

**IT IS FURTHER ORDERED** that Defendant's Motion in Limine to Preclude Testimony of Steven Allan Cohn (Doc. 33) is denied.